TENABO MINING & SMELTING CO. v. BATES.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2441.

EQUITY ⟨⟩415—DECREE—DETERMINATION OF ISSUES.

    In a stockholder's suit for the winding up of a mining corporation, the sale of its property, and distribution of the proceeds, on the alleged ground of insolvency and fraudulent conduct of its officers and directors, on all of which allegations issue was joined and full proofs taken, the entry of an order appointing a receiver, with instructions to sell all of the property of the corporation, without determining any of the issues so tried and submitted, *held* unauthorized and erroneous.

    [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 932–944, 946, 950, 951; Dec. Dig. ⟨⟩415.]

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Suit in equity by Charles D. Bates against the Tenabo Mining & Smelting Company. From the decree, defendant appeals. Reversed.

H. C. Edwards, of Salt Lake City, Utah, for appellant.

Corwin S. Shank and Horatio C. Belt, both of Seattle, Wash., and J. D. Skeen, of Salt Lake City, Utah, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The appellee instituted this suit in the court below, "in behalf of himself and all other stockholders of the defend-

ant Tenabo Mining & Smelting Company similarly situated, who wish to join in this bill, bear their proportion of the expenses of this suit, and become parties hereto." Both bill and answer are very long, but a comparatively brief statement of some of their contents will, we think, be sufficient for the proper disposition of the appeal.

The bill shows that the appellant, defendant below, is a mining company incorporated under the laws of the state of Nevada, November 14, 1908, with a capital stock of $3,000,000, divided into 1,500,000 shares, of the par value of $2 each, 450,000 of which shares were issued to another mining corporation, styled Gem Consolidated Mining Company, for certain mining claims owned by it and situated in Nevada, called Little Gem, Ollie, Reno, and Winnemucca, upon which, the bill alleges, there was at the time a mortgage to one McCormick for the sum of $15,000 and accrued interest, and 300,-000 shares to another mining corporation then existing, styled Tenabo Consolidated Mines Company, for certain mining claims and interests therein owned by that company, known as the Two Widows, Two Widows extension, Copper Hill group, and Nevada Phœnix. The bill also alleges that at the times mentioned the Little Gem claim had been developed by a shaft to a depth of about 400 feet, encountering a rich body of ore, the extent of which, however, had not been ascertained by development—the other claims being undeveloped and of unknown value, except such as attached to them by reason of their location in a mining region and close proximity to the Little Gem claim. The bill further alleges that one Tyree controlled the Gem Consolidated Mining Company, and one Locker the Tenabo Consolidated Mines Company, and that together they caused the incorporation of the defendant company for the purpose of taking over the properties of the two other mining companies, which was done, and that together they named and controlled the directors of the defendant company, and alleges various acts of fraud, both on the part of Tyree and Locker, and the directors of the defendant company, in the disposition of its 750,000 shares remaining in the treasury, and in respect to the moneys realized by the sale of a portion of that stock. The bill itself shows upon its face that the mortgage held by McCormick was paid out of the proceeds realized from the sale of a portion of the treasury stock of the defendant company, and it also shows that subsequently the defendant company, by its president and secretary, executed a mortgage on all of its property to one Shearman to secure a loan of $1,500. The bill also alleges the insolvency of the defendant corporation, and among its prayers are the following:

"(1) That the defendant be required to appear and show cause at a time certain why it should not be enjoined and restrained from selling, agreeing to sell, giving options to sell, or causing to be sold, and from permitting any of its officers, agents, trustees, or representatives to sell, transfer, or agree to sell, in the United States, France, or elsewhere, any of its treasury stock, or any of its capital stock not outstanding, and in the meantime, and until the said orator can be heard, that defendant, its officers, agents, trustees, and representatives, be temporarily enjoined from doing, or permitting to be done, any of said acts.

"(2) That defendant be required to appear and show cause, if it has any, why a receiver should not be appointed by this court, to take charge of all of the assets of said corporation located within the state of Nevada, and

particularly all mining property and claims owned, claimed, or controlled by said corporation, located in the county of Lander, state of Nevada, or elsewhere in said state.

"(3) That said receiver be authorized and directed to cause ancillary receivers to be appointed in states other than the state of Nevada, to sue for and recover all moneys and property lost or misappropriated by the directors or officers of said corporation.

"(4) That all of the assets of such corporation be sold and converted into money, and after payment of the costs and expenses of this proceeding, including counsel fees, that said assets be distributed among the creditors, and the surplus, if any, be distributed pro rata among the stockholders of defendant corporation.

"(5) That to enable the court to make a just distribution of said assets among the persons entitled thereto that the court cause proper notice to be given to all creditors and stockholders having claims against said corporation or stock therein, and, if claims or stock should be in dispute, that the same be established by the judgment of competent tribunals.

"(6) And your orator further prays, for himself and for all others similarly situated, for such other and further relief as the court may deem meet and proper."

The answer of the defendant company put in issue all of the numerous averments of fraud, and among other things denied that it ever sold or disposed of 300,000 shares of its treasury stock, or any amount thereof in excess of 167,250 shares, for which number of shares it admits it realized the sum of $26,687.50, out of which money it alleges that the amount due on the McCormick mortgage was paid. And among other things the answer—

"admits that the only source of income which the defendant has had has been from the sale of its treasury stock, but denies that said mining claims are undeveloped property, but admits that up to the present time the same have yielded no income whatever, but this defendant states that prior to the time when the above-described mining claims were conveyed by the Tenabo Consolidated Mines Company and the Gem Consolidated Mining Company to this defendant much development work had been done upon the same and large deposits of milling ore had been developed thereon in, to wit, more than 17,000 tons, of a net value in excess of $171,000."

The answer admits that on December 13, 1910, the defendant was obliged to and did borrow $1,500 from one W. H. Shearman with which to pay for the required annual assessment work upon the said mining claims, and that to secure the repayment of that borrowed money it executed a mortgage to Shearman upon all of said claims except the Copper Hill group, and—

"admits that said mortgage is unpaid, but denies that the same is due, and, on the contrary, this defendant states that the time of the payment of said promissory note for which said mortgage was given as security has been extended by said Shearman, and this defendant states that its assets are of sufficient value to enable it to borrow sums of money far in excess of the amount due upon said promissory note, and in addition thereto all debts due and owing by said defendant, with which to liquidate its present indebtedness."

The answer denies the alleged insolvency of the defendant corporation, and the alleged lack of value of its remaining treasury stock, and, on the contrary, alleges that the said remaining treasury stock is of a value in excess of 50 cents per share, and that all of it could and would have been sold by the defendant company, had it not been for the action of the plaintiff in bringing this suit. It alleges that the total

amount of the obligations of the defendant company is the sum of $8,297.75, and that the property owned and possessed by it is much more than sufficient to pay all of its indebtedness, and denies any mismanagement by the directors of the company.

To the answer the complainant duly filed a replication.

The numerous issues presented by the pleadings came on regularly for trial, and a large amount of evidence was given on behalf of each party tending to support their respective claims, among which is this testimony of a witness for the plaintiff:

"My name is Duncan MacVichie. I live in Salt Lake City. I am 52 years of age. I am a mining engineer. I have been such 25 years or more. I was with the Standard Oil people in Wisconsin and Minnesota from 1889 to 1897, and then in charge of the Mercur from 1897 to 1900, and then with the Bingham Consolidated Mining & Smelting Company for, I think, 8 years. I was general superintendent in all of these. I have examined the Little Gem property in Tenabo, Lander county, Nev. I did so in December, 1908. I was making a report for the board of directors. The ones I examined were: The Little Gem, four lode claims, a total of 70 acres; the Nevada-Phœnix, three lode claims, 52 acres; and the Two Widows group, one and a fraction, 21 acres—a total of 142 acres. These claims all joined each other. The claims of the Gem group joined each other; the Ollie, Winnemucca, and Reno. The Phœnix group contained the Gold Note No. 2, Phœnix, and Standard. The Two Widows was a full claim. The workings of the mines are as follows: It is developed by an incline shaft to a depth on the plane of the vein of about 375 feet, and by six levels, consisting of the 60, 90, 100, 200, 300, and bottom levels. There are upraises and two stopes; a small stope on the 200-foot level. I want to add here that I was unable to reach the bottom of the incline, due to water. It was about 20 feet deep, so that I am unable to say just what the bottom of the incline is like; but the workings are pretty thorough above the water level, which block out the ore pretty thoroughly. There is no ore in the 60, 90, and 100 foot levels. The east drift on the 200-foot level is approximately 300 feet in length. This drift bears to the north quite rapidly as it extends from the incline. The 200-foot level west is approximately 45 feet in length. The 300-foot level east, or easterly, would be approximately 100 feet in length. There is an incline driven in a westerly direction from just below the 300-foot level, to 90 feet in length. It is driven at about right angles to the strike of the vein. All of the levels show a well-defined vein, and the 200 and 300 foot levels, including the incline from the 200-foot level down, and the different raises, show a well-defined vein of merchantable sulphide copper ore. I estimated 7,783 tons straight smelting ore and 17,257 tons of concentrating ore was blocked out and ascertained by me. The smelting ore contained .125 ounces of gold; 17.46 ounces of silver; 5.92 per cent. copper. I did not get the iron contents. Figuring copper at 12 cents and silver at 56 cents per ounce would give a net value of $13.38. The present value is approximately $21.13. The gross value of a ton of matte is $175.20. Seven tons of ore goes into it. There would be $92.65 profit per ton of matte. That represents 7 tons of ore. It is absolutely necessary to put on a concentrating mill in order to make a success of the property. The proposition of this company presents possibilities a little beyond the average. The Little Gem will not take a large amount of money to demonstrate its value. The Nevada Phœnix, with its high-grade ore, makes possible the mining of narrow veins profitably. The Two Widows has ore of good commercial value. I do not consider the situation as favorable. I think it a very good geological venture. I consider that at the time I examined these properties that twice the amount of ore in sight was capable of being obtained."

### Cross-examination by Mr. Skeen:

"I do not do my own assaying. The Union assay office does all of it for me. They can verify the assays, if you wish. It cost about $4 per ton to mine the ore in 1908."

### Redirect examination by Mr. Edwards:

"The prospective values on the Gem and the Phœnix are very attractive; above the ordinary. On the Two Widows there was no ore developed there. The conditions are not particularly favorable to the Two Widows. In the Nevada Phœnix there is considerable ore exposed. It has considerable value. The ore is good quality. I think I would give $10,000 for it. To the 7,783 tons of straight smelting ore, this gives a net value of $111,530.39; on the 17,257 tons of concentrating ore, it gives a net value of $75,240.52—making a total net value of $186,771.91. The cost of erecting reduction works is:

| | |
|---|---|
| Concentrating mill | $25,000 00 |
| Matting plant | 30,000 00 |
| Total | $55,000 00 |

—leaving an estimated profit on the present available ore of $131,770.91. This is the most reliable plan of estimating in the United States; suggested by the Engineering and Mining Journal of New York City."

The foregoing testimony on the part of the plaintiff finds corroboration in the following testimony of the witness Alfred E. Raleigh for the defendant company:

"My age is 42 years. I reside at Tenabo, Nev., and have since 1905; am in mining business, and have been for 35 years. I went to Tenabo when the camp was just struck, and have watched its development closely; have been in the employ of the Tenabo Mining & Smelting Company, and was before that. I was in the employ of the Tenabo Consolidated Mining Company. They owned the Gem claim. Before that, I was in the employ of the Reliance Milling & Mining Company. That company also owned the claim prior to the time that the Tenabo Consolidated came in. I supervised the opening up of that claim. There is a fissure vein on the claim, and it appears upon the surface. It can be traced for 500 feet. The incline shaft that has been testified to by Mr. MacVichie in his report is the shaft or incline from which the main workings have been done upon the ground. It is about 320 feet deep. The length of the longest shaft is about 400 feet. I have discovered an ore chute in this vien. It is about northwest with reference to the collar of the shaft. The ore chute that I have discovered is about 350 feet, and runs from 5 feet at the surface to 4 feet at the bottom. I followed the vien down from its entire depth. The vein is 14 feet wide there, with good walls. Between the collar of the shaft and the lowest level a drift has been run about 50 feet. There is another one at 100 feet, running to the north about 20 feet. The next level, about 50 feet deeper than the shaft, there is a cross-cut, the drift running about 75 feet. At 300, there is a drift running about 350 feet to the northwest, and opposite that there is a drift running to the south about 600 feet, and down at the 300 there is a drift running to the east, and there is where the forks—the main shaft that they are running now—the ore chute—turns to the south, and there is a drift running off from that 60 feet; then this long part of the incline runs on through; that is, the 400-foot incline. There is a raise in that incline, and a good deal of stoping done in there. Those workings generally penetrate the ore chute. The ore chute extends from the lowest level made in the mine to the surface. It is continuous all the way. There is nothing in the lower workings to indicate that the vein will not continue into the depth. It all indicates that it will. About the 28th of March last I saw Mr. Kimball and Mr. Sizer going down into the Gold Quartz. I do not know what they did. I do not know that they examined the Gem. I told them I would not have anything to do with their examination, unless there were instructions from the president."

### Cross-examination:

"The length of your chute is about 360 feet. I have seen it at all the distance. It is continuous that entire distance. In the last three years we have not added in depth to the main shaft or incline, nor to the main level or the shafts or levels, in any part of the mine. I am sinking a shaft from

the surface there now in order to get air. We have run a raise from just on top of the water 290 feet depth. The length of that raise is 90 feet. When I left the other day, the air shaft was down between 35 and 40 feet. We have done some assessment work on the surface. We have done some work on the other mine there in the last three years. I have done the work on all 11 claims. In the Copper Hill group there are 4 claims, and we have done $400 worth of work on those claims each year in driving a tunnel. That tunnel, after the first 15 feet, is all in copper ore. The development that has progressed has increased the favorable conditions of the geology of the property. We have taken out but have not shipped any ore. I have taken out ore all the time. At the Copper Hills, we did that as assessment work. The work in taking out the ore was simply the equivalent of $100 on each claim. There are 11 claims. The Copper Hill group of claims is located about 12 miles from the Gem property."

The evidence also showed, among other things, that on the 5th day of February, 1910, John Janney, Benner X. Smith, E. O. Howard, W. Mont Ferry, and John Pingree were elected directors of the defendant company and served as such during all the times in question; that on the 22d of March, 1910, the defendant company, through its board of directors, entered into a contract with P. B. Locker, by which he was appointed agent and attorney in fact, and authorized to sell 450,000 shares of its treasury stock, he to receive for his services in that behalf all in excess of 50 cents per share. The contract recited, among other things:

That Locker "is desirous of undertaking the sale of said stock, and represents and believes that he can sell a portion of this stock in France or elsewhere, provided the necessary authority be given him to negotiate and execute a contract on behalf of the company and to list the stock upon a French banking market, or other markets," and contained his agreement "to provide and furnish all the fees and expenses for the listing of each 150,000 shares of stock provided for in a special power of attorney set forth in the minutes of the company, and all other expenses required by the law of France or elsewhere, and all trustee's fees and expense, and he further agrees at his own expense to go to Paris in the interests of this company and use diligent effort to negotiate said contract."

The contract contained these further stipulations:

"It is mutually agreed that the entire amount of money received from the sale of said stock shall be deposited to the credit of the company upon the delivery of certificates of stock. It is expressly understood and agreed that the company shall in no way be liable for any fees or expenses for the listing of said stock, or trustee's fees and expenses, or any other expenses whatsoever, and that each and every share of stock so sold shall net the company 50 cents per share. From the first money received from the sale of stock, the company shall pay the said Locker the first $15,000 advanced to pay taxes and dues for listing the stock on the French market and the $3,000 fees to the trust company. The company shall, however, be reimbursed said amounts from the moneys received from the sales in excess of said amounts before said Locker shall be entitled to any compensation; the intention being that each and every share of stock sold shall net the company 50 cents per share. Should the sale of stock be not sufficient to net the company 50 cents per share, the said Locker agrees to reimburse the company in stock out of his personal stock in an amount equal to the amount taken from the treasury and for which the company has not received 50 cents net per share. The time allowed said Locker for the carrying out of this contract shall be as follows: Sixty days within which to furnish satisfactory proof that the company has entered in contractual relations with reliable persons whereby the sum of $15,000 will be furnished to the agent as needed for listing; then 90 days to effect his negotiations in Paris or elsewhere and procure the execution of a satisfactory contract as set out in said special power of attorney: Provided,

that in computing these periods of time, the months of June, July, and August shall be excepted, because of the summer season. Nothing in this contract shall be construed to require the agent to sell any of the said stock in France, but, on the contrary, he may negotiate the sale of the stock at any other place or places desired by him."

There was also introduced in evidence a large number of letters passing between Locker and Janney, and between Locker and the defendant company and various other parties, in respect ·to the sale of the said stock, and much testimony in respect to arrangements made by Locker with various French banking institutions in regard thereto, and testimony tending to show that the arrangements so under way were about to be consummated when the present suit was brought. There was also testimony to the effect that the treasurer of the defendant company, who was cashier of Walker Bros. Bank of Salt Lake City, received from Locker between $2,900 and $3,000, which money was disbursed in the course of the business of the corporation, and there was evidence to show that the directors of the defendant company allowed themselves a monthly compensation of $50 each, and that they were also given a certain amount of the stock of the company. in consideration of their services.

There was other evidence given in the case bearing upon its merits, but enough has been stated to show that the trial court was called upon to render judgment disposing of the issues in the case. Instead of doing so, the court, after a trial of those issues, at the conclusion of all of the evidence, without deciding a single one of them, entered a "decree" appointing a receiver, undertaking to authorize him to, among other things, "sell for cash at public sale all of the real and personal property of said defendant corporation"—the full "decree" being as follows:

"This cause came on regularly to be heard, and was argued by counsel for the respective parties, and upon consideration thereof it was ordered, adjudged, and decreed:

"I. That J. P. Raine, of Pine Valley, state of Nevada, be and he is hereby appointed receiver of the Tenabo Mining & Smelting Company, defendant herein, a corporation organized under and pursuant to the laws of the state of Nevada, and said receiver is hereby authorized and directed forthwith to take possession of all of the real and personal property of said corporation located within the state of Nevada, including all books, papers, and documents of every name, nature, and description, and particularly the following mining claims: Little Gem, Ollie, Reno, Winnemucca, Two Widows, Two Widows extension, Copper Hill group, and Nevada Phœnix—together with all machinery, tools, appliances, and other personal property located upon or used in connection with said mining claims, all of which said property is located in Lander county, state of Nevada.

"II. To examine, or cause the books and records of the defendant Tenabo Mining & Smelting Company to be examined, and from said books, and from such other sources of information as may be available, to ascertain:

"(a) The authorized capitalization of said corporation, the number of shares issued and outstanding on the 1st day of October, 1912, and the number of shares in the treasury of said corporation on said date; also whether or not stock has been issued and sold by the officers and agents of said corporation since said date, and, if so, to whom and for what consideration.

"(b) To ascertain from said books and otherwise the money on hand on the 1st day of October, 1912, if any, and the nature and amount of the indebtedness of said corporation, to whom and when payable, and whether in money or in stock of said corporation; also whether or not any indebtedness has been incurred by the officers and agents of said corporation since the 1st day

of October, 1912, and, if so, the nature, amount, and consideration of said indebtedness.

"III. To sell for cash at public sale all of the real and personal property of said corporation, and particularly the following mining claims located in Lander county, state of Nevada, to wit: Little Gem, Ollie, Reno, Winnemucca, Two Widows, Two Widows extension, Copper Hill group, and Nevada Phœnix—together with all machinery, tools, and appliances, and all other property owned by said corporation and located in the state of Nevada, said sale to be made upon said premises at Tenabo, in Lander county, state of Nevada; it appearing to the court that it is best to sell the said personal property in the manner hereinbefore specified: Provided, that said receiver shall first give notice of said sale of [by] publication thereof for at least once a week for four weeks prior to said sale, in a newspaper printed, regularly issued, and having a general circulation in Lander county, state of Nevada, if any such there be, and if there be no such newspaper published in said Lander county, or if the receiver in his discretion shall consider some other paper more advantageous, then the publication shall be in such paper so specified or selected, and having a general circulation in the state of Nevada, and said notice shall specifically describe the real and personal property to be sold: Provided, that said property shall not be advertised for sale, nor sold, until after the lapse of ninety (90) days from date hereof, nor until the further order of the court fixing the time of sale, and other conditions, if any, that the court may deem proper.

"IV. Said receiver is hereby directed to give notice to all creditors by publishing such notice in the ———, once a week for four consecutive weeks, directing all creditors to file their verified claims with the receiver at an address to be specified, within 90 days from the date of the first publication of such notice, and that all claims not so filed shall be barred, and shall likewise mail a copy of said notice to each known creditor: Provided that, before the presentation of any claims for the approval of this court, notice thereof, with a list of such claims, shall be served upon the attorneys of record herein.

"V. Said receiver is hereby directed to keep a complete record of his doings in the premises, including an inventory of all property received, held, or sold, all money expended and debts incurred, and at the earliest practicable date report fully to this court the exact status and condition of the affairs of said corporation, and of his administration thereof.

"The said receiver is further directed to hold all cash received from any source, to be disbursed under the orders of this court, for the payment of expenses of this receivership, including such reasonable alowances as solicitors' fees and expenses for bringing this action as the court may deem proper, and distribute the balance under the orders of this court.

"VI. That before entering upon the performance of his duties as such receiver said J. P. Raine shall take an oath of office to faithfully perform and discharge his duties, and execute and deliver to the clerk of this court a good and sufficient undertaking, conditioned as provided by law, in the penal sum of $7,500, payable to the clerk of this court; the court hereby reserving the right to increase said bond at any time.

"Dated this 14th day of February, A. D. 1914."

The "decree" is reversed, and the cause remanded to the court below, for a determination of the issues in the case, and for such judgment thereon as may be appropriate and proper.